TREMONT TRUST COMPANY *v.* GILBERT H. NOYES & others.

Suffolk.    April 12, 1923. — September 13, 1923.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & CARROLL, JJ.

*Bills and Notes*, Consideration, Validity.   *Fraud.   Trust Company.   Evidence*,
Presumptions and burden of proof.   *Estoppel.   Agency*, Fraud of agent.
*Corporation*, Officers and agents.   *Contract*, What constitutes, Implied.

The active manager of a trust company, who was one of its vice-presidents,
a member of its board of directors and of the executive committee of the
board, caused his son, its treasurer, fraudulently to fill in blanks, in a note
signed by another member of the executive committee and sent to the
treasurer for the purchase of shares of its stock, so that the amount was
ten times what was authorized by the signer and the note was a joint and
several instead of the single obligation authorized, and then signed it himself
and caused it to be signed by six other directors, upon representations
that it was to be used to purchase shares of stock which he had been carry-
ing in his own name for the company.   The note then fraudulently was
placed in the savings department of the trust company in payment of a
personal note of the manager secured by an unrecorded mortgage of real
estate and the note and mortgage were given up by the company.   In an
action by the trust company against the makers of the note, a verdict for
the plaintiff against the active manager of the trust company and verdicts
for the other defendants were ordered.   *Held*, that

(1) A verdict properly was ordered for the plaintiff against the active
manager, there being no evidence to rebut the presumption of fact that
the note was issued for a valuable consideration as to him, and there being
express evidence showing such consideration; and he being estopped by
his own conduct to deny his liability;

(2) If it was found that the treasurer in the fraudulent transactions as
to the note was acting solely as an officer of the plaintiff and not in an in-
dependent fraud for his own or his father's benefit, the plaintiff was bound
by his acts and could not recover against the makers other than the active
manager;

(3) If it was found that the treasurer was a mere tool of his father, the
active manager, or acting in collusion with him for his benefit and thus
committing an independent fraud on his own account although in the in-
terest of another, the father and son alone represented the plaintiff in the
transaction and, although they were perpetrating a fraud, the plaintiff
could not claim the advantages of their fraudulent acts without assuming
the imputation of their knowledge, and all the other makers of the note
would be exonerated;

(4) The verdict for the defendants other than the active manager properly
was ordered;

(5) The fact, that the plaintiff gave value for the note in suit by the
surrender of the earlier note of the active manager secured by the unre-
corded mortgage, was not sufficient to show that it was a holder in due
course, such surrender being a part of the fraudulent scheme to which the
other makers of the note were not parties;

(6) The defendants other than the active manager were not bound to put the plaintiff *in statu quo* by restoring to it the note and unrecorded mortgage which had been surrendered for the note in suit.

At the trial of the action above described, it appeared that the entries on the books of the plaintiff as to the transactions relating to the note were made by an employee who received the note and filed it in the savings department, and there was evidence that he was in charge of the savings department but there was no evidence touching his authority or official position as to the business of the plaintiff except the testimony of the fraudulent treasurer to the effect that in all matters relating to this note the employee acted under his direction. It also appeared that the investment committee of the plaintiff approved of the note, but not until forty-five days had elapsed after it had been discounted by the plaintiff. *Held*, that the circumstances, under which the entries were made on the books of the plaintiff and the note was approved by the security committee, did not relieve the plaintiff of the necessity of bearing the burden of the fraud of the treasurer and of the active manager when it sought to collect the proceeds of the note resulting therefrom.

In the circumstances above described, the fact that some of the signers of the note were members of the plaintiff's executive committee did not relieve the plaintiff from the fraud of its agent or agents.

At the trial of the action above described, it appeared that, after the treasurer of the plaintiff fraudulently had filled in the blank spaces in the note above the signature of the member of the executive committee who had delivered it to him for another purpose, the treasurer presented it to other members of the committee for their signatures and at the same time presented to them and procured their signatures upon a trust agreement, to which the plaintiff was not a party, placing the shares of stock, which, it was represented, were being taken over from the active manager, in the name of such manager as trustee to receive the dividends, to pay them on account of the note and interest, and, when the note was fully paid, to divide the shares among those named as beneficiaries under the agreement. The member who originally had delivered the note in blank to the treasurer was named in the body of the agreement as a beneficiary, but he did not sign it and knew nothing of it. *Held*, that, in the circumstances, the fact that the others signed the agreement did not make them liable as makers of the note.

One of the makers of the note was another son of the active manager of the plaintiff and also was its general counsel. Over two months after the note was discounted by the plaintiff and nearly a month after it was approved by the plaintiff's investment committee, he coöperated with his father in a letter to the commissioner of banks in which occurred the statement: "Complying with your request, I am here, to the best of my knowledge and belief, naming the makers, amounts and particulars of the notes about which you have made inquiry from me. Note of . . . [naming those whose signatures were upon the note] in the sum of $25,000. The makers are all known to you." *Held*, that such participation alone did not estop the general counsel from relying on the defences available to the defendants other than the active manager.

The plaintiff was not a holder in due course of the note as to any defendant except the fraudulent active manager.

Upon the evidence above described, the action could not be maintained either upon a count in the declaration alleging that at the request of the defendants the plaintiff had applied assets of its savings department to the purchase of shares of its stock for them and that the defendants had received such shares and severally had agreed to pay the plaintiff therefor, nor upon a count alleging that the plaintiff had paid money " to the use of " the defendants. .

CONTRACT against Gilbert H. Noyes, Simon Swig, John P. Feeney, David I. Robinson, Michael Regan, Harry Roberts, Frederick E. Pierce and Louis Swig, with a declaration, as amended, in three counts. In the first count the plaintiff declared against the defendants as makers of the promissory note described in the opinion. In the second count the plaintiff alleged, " that at the request of the defendants it applied assets of its savings department of a value of $25,000 to the purchase of two hundred shares of its stock for the defendants, and the defendants received said shares and severally agreed to pay the plaintiff therefore the sum of $25,000 with interest on demand," which they had failed and refused to do. In the third count, the plaintiff claimed $25,000 as money paid by the plaintiff " to the use of " the defendants. Writ dated August 15, 1921.

The defendant Robinson died, and the action was discontinued as to him.

In the Superior Court, the action was tried before *Morton,* J. Material evidence is described in the opinion. At the close of the evidence, the judge ordered a verdict for the plaintiff against the defendant Simon Swig for $26,250 and for the defendants Noyes, Feeney, Regan, Roberts, Pierce, and Louis Swig and reported the action to this court for determination, with the stipulation that, if his rulings were correct, judgments were to be entered on the verdicts; and, if his rulings were wrong, there was to be a new trial.

The pertinent statutory provisions in the General Laws being in every material particular the same as those in force at the date of the note, the statutory references in the opinion for the sake of convenience are to the General Laws only.

The case was submitted on briefs.

*R. G. Dodge & R. S. Wilkins,* for the plaintiff.

*H. Le B. Sampson & M. A. Shattuck,* for the defendant Noyes.

*J. H. Vahey & P. Mansfield,* for the defendant Feeney.

*F. J. Lawler,* for the defendant Pierce.

*G. L. Mayberry, L. A. Mayberry & W. F. Levis,* for the defendant Louis Swig.

RUGG, C.J. This is an action of contract. There are three counts in the declaration. The first count is on a joint and several promissory note dated January 7, 1919, signed by all the defendants as makers, payable to the order of the plaintiff. The second count alleges that the plaintiff at the request of the defendants applied $25,000 of its savings department assets to the purchase of two hundred shares of its stock for the defendants, which the defendants received and agreed to pay to the plaintiff therefor on demand, and that demand has been made and payment refused. The third count is for $25,000, money paid to the use of the defendants.

The face of the note, partly printed and partly written, is in these words:

" THREE NAMES

$25,000 xx/100          Boston, Mass., *January 7, 1919.* *On demand* after date, for value received, the undersigned *jointly & severally* hereby promise to pay to the TREMONT TRUST COMPANY, or order, at the office of the company, 14 State Street, Boston, *Twenty-five thousand xx/100* Dollars *With int. at 4%*

| | |
|---|---|
| David I. Robinson | X  G. H. Noyes |
| Michael Regan | Address  C/o R. H. White Co. |
| Harry Roberts | Simon Swig |
| Frederick E. Pierce | John P. Feeney." |
| Louis Swig | |

The words and figures italicized were written by Benjamin H. Swig, treasurer of the plaintiff and son of Simon Swig. The words " THREE NAMES " were stamped on the face of the note in the usual course of business before or at the time of its discount. See G. L. c. 168, § 54, cl. 9 (a). The rest of the face of the note, except the names of the makers, was a printed form. The genuineness of the signatures on the note was conceded.

The makers of the note and their official relations to the plaintiff were as follows: Simon Swig, vice-president, director

and member of executive committee and the active manager of the Trust Company; Louis Swig, son of Simon Swig, general counsel; Feeney, Noyes, Pierce, Roberts and Robinson, directors and members of the executive committee, the two former later being also vice-presidents; Regan, assistant secretary. Robinson died prior to the trial and the action was discontinued as to him.

The cash book of the savings department of the plaintiff with reference to the note showed a payment on January 21, 1919, of $25,000 on a note of " G. H. Noyes, Simon Swig and John P. Feeney " as a loan on personal security. Those three were the only names on the note when it was discounted. The other five names were added at intervals within a few weeks thereafter. This note was used to pay a demand note of Simon Swig for the same amount dated January 25, 1918, also held in the savings department and secured by an unrecorded mortgage on real estate of the maker. The proceeds of the latter note were credited to the deposit account of Simon Swig with the plaintiff. There was no record on January 7, 1919, concerning the note here in suit. On January 21, 1919, no check was made by the plaintiff on account of the note. The bookkeeper made an entry that the note here in suit was discounted and the earlier note of Simon Swig secured by the unrecorded mortgage was paid.

The note here in suit, although discounted on January 21, 1919, was not approved by the investment committee of the savings department of the Trust Company until March 7, 1919. No information was given to the investment committee at that time nor at any other time, so far as appears, as to the circumstances attending the signing of the note by the several defendants. When the note was received by the plaintiff, the entries on its books concerning it were made by one Ellis, by whom it was received and filed in the savings department. There was evidence that Ellis was in charge of the savings department, but no evidence touching his authority or official position as to the business of the plaintiff except the testimony of Benjamin H. Swig to the effect that in all matters relating to this note Ellis acted under his direction.

On January 7, 1919, the records of the plaintiff showed a transfer of two hundred shares of capital stock of the plaintiff from the name of Simon Swig to " Simon Swig, trustee, by virtue of agreement with certain shareholders January 7, 1919." Eight indorsements of payment on the note bearing date between March 1, 1919, and January 3, 1921, were all the dividends received on these two hundred shares of stock.

The plaintiff was closed by the commissioner of banks on February 17, 1921. At that time the note was carried in the assets of its savings department.

The defendant Noyes testified that Simon Swig in conversation expressed the wish to sell stock in the plaintiff and asked him to take twenty shares. Noyes, supposing that he was dealing with the plaintiff and not buying from Simon Swig, agreed to take them provided he could pay by giving his personal note instead of cash, the selling price being either $125 or $130 per share. Later, shortly before December 14, 1918, when Noyes was about to leave for New York on his way to Europe, he said to Benjamin H. Swig, treasurer of the plaintiff, that he desired to attend to the purchase of the twenty shares of stock which he had told Simon Swig he would buy. Benjamin H. Swig took his New York address and promised to communicate with him there. A day or two later he received in New York a letter on the letterhead of the plaintiff, signed by Benjamin H. Swig as treasurer, enclosing the note here in suit in blank and " asking him to sign this note for the twenty shares of stock which the witness had agreed to take." He signed the note in blank and returned it to Benjamin H. Swig with a letter stating that he was uncertain whether the price per share was $125 or $130 and asking Benjamin H. Swig " to fill in the note for the right amount . . . $2500 or $2600 as the case might be." When thus returned, the note bore only its printed words and the written words " G. H. Noyes C/o R. H. White Co." Noyes had no knowledge or notice that other names were to be put on the note and never authorized any one to add other names as makers or to fill in any amount except $2,500 or $2,600 or to insert the words " jointly and

severally," " and would not have executed the note if he had known that any other names were to be added." He did not know of the present condition of the note until July or August, 1921.

No question was made by the plaintiff as to anything to which this witness testified. It must be accepted as true so far as concerns the plaintiff.

The treasurer of the plaintiff, Benjamin H. Swig, testified that he received the printed form of note from Noyes with no other writing then upon it except the signature " Gilbert H. Noyes C/o R. H. White Co." accompanied by a letter in which Noyes stated that the note signed by him was in regard to the twenty shares of stock and asking the witness to fill it out because he, Noyes, did not know the exact amount. " The witness left the note on his desk and did nothing with it until two or three weeks later. Some time in the early part of January, 1919, he took the matter up with his father " and asked him what he wanted to have done. His father told him that he had talked with some members of the executive committee and they had told him that they would take up temporarily the two hundred shares of stock which he had bought for the benefit of the Trust Company and had been carrying for some time, and that they were going to carry these shares on their note until the shares could be sold and their note cancelled. His father told him " to fill out the note," told him those who had promised to sign the note, and " told him to get their signatures on it." He followed these directions and secured whatever signatures are on the note except that of Noyes.

Each person except Noyes at the time of signing the note also signed an agreement bearing the same date as the note. In that agreement Simon Swig was named as " trustee " and was party of one part, and Noyes, Robinson, Roberts, Regan, Feeney, Pierce and Louis Swig were named " beneficiaries " and parties of the other part. Their names were all written at length with their residences in the opening paragraph of the agreement. Noyes did not sign the agreement and appears to have known nothing about it, but all the other signers of the note also were signers of the

agreement. The agreement recited that the trustee and beneficiaries had recently acquired two hundred shares of the capital stock of the plaintiff, " the said stock standing in the name of ' Simon Swig, trustee,' " and that " it was agreed prior to the acquisition of said shares, that the trustee should execute a declaration of trust," and declared that the trustee held the stock and all dividends and income thereon upon equal trusts for himself and the beneficiaries with right to sell the whole or any part, that proceeds of said shares should be applied " on the payment of a note of twenty-five thousand dollars given by said trustee, and the beneficiaries herein to the Trust Company, the said note being a demand note, dated January 7, 1919." Upon payment of the note the trust was to terminate and " all sums of money then in the hands of the said trustee over and above the amount paid by him in satisfaction of said note shall be divided by the said trustee between himself and the beneficiaries herein share and share alike." The beneficiaries agreed to indemnify the trustee.

As to the circumstances under which the others, aside from Noyes and Simon Swig, signed the note there was evidence to the effect that John P. Feeney was asked to sign the note by Simon Swig to help the bank, that Simon Swig referred him to Benjamin H. Swig, who said that " all the members of the executive committee, including the president, were going to sign it . . . that they were making a new note to accommodate the bank, that his father had been carrying these shares along for some time, and that he wanted to have the executive committee carry them along for the benefit of the bank." All the others signed the note upon representations by Benjamin H. Swig of a somewhat similar nature with some variations in details.

Louis Swig testified that he coöperated with his father, Simon Swig, in the preparation of a letter signed by the latter, dated April 2, 1921, to the commissioner of banks, in which occurred the statement,

" Complying with your request, I am here, to the best of my knowledge and belief, naming the makers, amounts and particulars of the notes about which you have made inquiry from me.

" Note of Gilbert H. Noyes, John P. Feeney, David I. Robinson, Simon Swig, Michael Regan, Frederick E. Pierce, Louis Swig and Harry Roberts in the sum of $25,000.00. The makers are all known to you."

In fact all the members of the executive committee did not sign the note, two members refusing to become parties to it. Some signed who were not members of that committee.

There was evidence that the certificate for two hundred shares of capital stock of the plaintiff in the name of Simon Swig, trustee, was not to be found among the assets of the plaintiff when the commissioner took possession.

The jury might have found the facts to be according to the evidence which we have narrated or summarized, and might have drawn from it all reasonable inferences. The case was heard before a judge sitting with a jury. At the close of the evidence, a verdict was directed for the plaintiff against Simon Swig for the principal of the note with interest, less payments credited on the back of the note, and verdicts were directed for all the other defendants; and the correctness of these rulings was reported.

No argument has been made in behalf of Simon Swig. It is the general rule both at law and in equity that the court does not consider questions of law not argued by a party. *Commonwealth* v. *McCue*, 121 Mass. 358. *Commonwealth* v. *Dyer*, 243 Mass. 472, 508, and cases collected. *Iasigi* v. *Shea*, 148 Mass. 538. *Forbes* v. *Thorpe*, 209 Mass. 570, 578. Since the case comes up on report and since the conduct of Simon Swig is so interwoven with that of Benjamin H. Swig, his case is considered. *First National Bank of Grafton* v. *Babbidge*, 160 Mass. 563.

It is plain on this record that Simon Swig was conversant with every infirmity of the note, placing his name upon it with knowledge of the fraud practised on Noyes and having instigated that fraud in contemplation of the other signatures to be procured. He did not testify in his own behalf. *Attorney General* v. *Pelletier*, 240 Mass. 264, 316. There is a presumption that the note was issued for a valuable consideration. G. L. c. 107, § 51. There was express evidence to that effect. So far as concerned Simon Swig, there

is nothing to rebut that presumption. *Indiana Flooring Co.* v. *Rudnick*, 236 Mass. 90, 93. Verdict rightly was directed against him. He is estopped by his own conduct to deny liability on the note. *Prudential Trust Co.* v. *Moore*, 245 Mass. 311.

The note here in suit began as a blank signed by Noyes without being filled out by him. Such an incomplete instrument *prima facie* carries with it authority to fill in the blanks. That *prima facie* authority may be met by proof of the authority actually given. That was shown by the testimony of Noyes, as to which no question is raised by the plaintiff, to the effect that he transmitted the note to Benjamin W. Swig, treasurer of the plaintiff, with express instructions as to filling the blanks. These instructions were grossly violated. The amount of the note was made nearly or quite ten times the authorized amount. It was converted into a joint and several note. A rate of interest was added. It was used for an unauthorized purpose. The names of two others were added as makers before the note was discounted by the plaintiff, and five others signed as makers after the note was discounted by the plaintiff. The presentation of the note thus so fraudulently filled out to the other defendants for their signatures, without disclosure of its infirmaties, was itself a fraud. Other misrepresentations appear to have been made to most if not all the others who signed the note.

It is manifest from this summary of the evidence that the plaintiff throughout the entire transaction, as to all the defendants other than Simon Swig (and they will hereafter be termed the defendants), was represented mainly by Benjamin H. Swig. He was treasurer of the plaintiff. He was the officer who naturally might deal with parties as to the discount of a note. He was the agent of the plaintiff. Where an agent has knowledge of a fraud but is acting for his principal and not perpetrating an independent fraud, the knowledge of the agent is imputed to the principal. Notice to the agent of the nature of any transaction within the scope of the agency is constructive notice to the principal. That is the general rule. *Brooks* v. *Shaw*, 197 Mass. 376,

380. *Cotter* v. *Nathan & Hurst Co.* 218 Mass. 315. *Merchants National Bank* v. *Marden, Orth & Hastings Co.* 234 Mass. 161, and cases collected at page 171. There is, however, an exception to this general rule. The statement of that exception often has been that, where the agent is engaged in an independent fraudulent act, his knowledge is not imputable to the principal. *Innerarity* v. *Merchants National Bank,* 139 Mass. 332. *Allen* v. *South Boston Railroad,* 150 Mass. 200. *Indian Head National Bank* v. *Clark,* 166 Mass. 27. *Broadway National Bank of Chelsea* v. *Heffernan,* 220 Mass. 247. *American National Bank of Nashville* v. *Miller,* 229 U. S. 517. But that exception does not obtain when the transaction, so far as concerns the principal, is undertaken and consummated wholly by the faithless agent in the prosecution of his perfidious scheme without the innocent intervention of any other agent of the principal and the principal does not repudiate that scheme when informed of it but undertakes to avail himself of its fruits. Where the assets of the principal are by the hand of the treacherous agent in execution of the fraud exchanged for the new security, be it note or other thing of value, then the knowledge of the agent is imputed to the principal. If the faithless officer acts alone in discounting a note and misappropriating the proceeds, then the bank is bound by his knowledge of the circumstances under which he had obtained it from the defendants. A subsequent ratification by officers ignorant of the nature of the original transaction does not change its character. *Atlantic Cotton Mills* v. *Indian Orchard Mills,* 147 Mass. 268. *First National Bank of Grafton* v. *Babbidge,* 160 Mass. 563, 565. *Corcoran* v. *Snow Cattle Co.* 151 Mass. 74, 75. *Schmidt* v. *Bank of Commerce,* 234 U. S. 64. *Lloyd* v. *Grace, Smith & Co.* [1912] A. C. 716. Under these circumstances another principle of law becomes operative, namely, that where one undertakes to profit by the act of another as agent, he must adopt that act as a whole and take the bitter with the sweet. One cannot take the gains of a fraud without also bearing its burdens. *Rackemann* v. *Riverbank Improvement Co.* 167 Mass. 1. *Attorney General* v. *American Legion of Honor,*

206 Mass. 158, 161. *Attorney General* v. *American Legion of Honor,* 206 Mass. 188, 189. *Dennette* v. *Boston Securities Co.* 206 Mass. 401. *Bodine* v. *Berg,* 53 Vroom, 662.

The case at bar falls within this principle. If Benjamin H. Swig was acting as officer of the plaintiff, the plaintiff is bound by his misconduct and misrepresentations and cannot recover on general principles of the law of agency. If Benjamin H. Swig was the mere tool of Simon Swig or was acting in collusion with the latter for his benefit, and was thus committing an independent fraud on his own account although in the interests of another, then these two alone represented the plaintiff in the transaction and, although they were perpetrating a fraud, the plaintiff cannot claim the advantages of it without assuming the imputation of their knowledge, and thus the defendants would be exonerated. Whichever view the jury might have taken of the facts, the plaintiff could not recover.

In this connection the fact that the plaintiff was a holder for value of the note through the surrender of the earlier note of Simon Swig secured by the unrecorded mortgage is not sufficient to show that it was a holder in due course. That surrender was not made with the knowledge, request or assent of any of the defendants except Simon Swig. It was a part of the fraudulent scheme to which the other defendants were in no sense parties. The plaintiff has lost the benefit of the security of that unrecorded mortgage; but that has resulted solely from the dishonest conduct of its officers.

It follows from these facts that the defendants other than Simon Swig are not bound to put the plaintiff *in statu quo* by restoring to it that note and unrecorded mortgage. The principle of cases like *Thayer* v. *Turner,* 8 Met. 550, and *Owen* v. *Button,* 210 Mass. 219, 222, is not applicable.

The relation of Ellis to the transaction does not show that he acted for the plaintiff in an independent executive capacity. The same is true of the approval of the note by the investment committee long after its discount.

That some of the signers of the note were members of the executive committee does not relieve the plaintiff from the fraud of its agent or agents.

The factor that the defendants other than Noyes were parties to the trust agreement does not affect this aspect of the case. Noyes was named in the body of the agreement as a beneficiary and never signed it. The fraudulent representations which induced their signatures to the note and all the circumstances did not warrant a finding in favor of the plaintiff.

The case at bar is distinguishable in essential particulars from *Prudential Trust Co.* v. *Moore,* 245 Mass. 311, and from cases like *Innerarity* v. *Merchants National Bank,* 139 Mass. 332, *Indian Head National Bank* v. *Clark,* 166 Mass. 27, and *Liberty Trust Co.* v. *Tilton,* 217 Mass. 462.

For the reasons already stated, it is not necessary to discuss or decide whether any or all of the facts would exonerate Noyes or the other defendants provided the plaintiff was a holder in due course without notice, G. L. c. 107, §§ 36, 75, 147, 148. *Boston Steel & Iron Co.* v. *Steuer,* 183 Mass. 140, 145. *Liberty Trust Co.* v. *Tilton,* 217 Mass. 462.

Participation by the defendant Louis Swig in the letter of April 2, 1921, to the bank commissioner does not estop him from relying upon the defences available to the other defendants. There is nothing to warrant a finding that at that time he knew or was chargeable with notice of the initial infirmity attendant upon the relation of Noyes to the note.

It follows that the plaintiff is not a holder in due course of the note here in suit as to any defendant except Simon Swig. G. L. c. 107, §§ 75, 78, 82.

There was no error in the direction of the verdict as to the second and third counts. The transaction so far as concerned the plaintiff rested wholly upon the note. There is no evidence to support a finding that the defendants requested the plaintiff to buy two hundred shares of its capital stock for them and agreed to reimburse it for the purchase price. The trust company was not a party to the agreement of January 7, 1919, nor bound by its terms. It was not addressed to the plaintiff. It is not susceptible of being construed as a request to the plaintiff to buy the shares of stock. There is no evidence to warrant a finding that, apart from the note, money was paid to the use of the defendants.

Whatever might be the force and effect of that agreement as to the other defendants, if Noyes had not signed the note and had not been named in the recitals of the agreement as a beneficiary of the trust, the admitted facts as to his signing the note cannot be met and overcome by the agreement under all the circumstances here disclosed.

It becomes unnecessary to discuss the other questions raised or to comment on the joint and several frauds attempted or consummated by Simon Swig and Benjamin H. Swig.

In accordance with the terms of the report, the entry may be                                    *Judgments on the verdicts.*