UNION OLD LOWELL NATIONAL BANK *vs.* F. WARD PAINE
& others
(and a companion case [1]).

Suffolk.    January 2, 1945. — June 4, 1945.

Present: FIELD, C.J., LUMMUS, QUA, & WILKINS, JJ.

*Bailment.  Conversion.  Agency,* Agent's knowledge, Agent's fraud, Ratification.  *Bona Fide Purchaser.  Sale,* Parties.  *Practice, Civil,* Case stated; Auditor: findings, report of evidence; Agreed statement of facts.

Statement by WILKINS, J., of the scope of review in this court in an action heard by an auditor whose findings of fact are final and whose report constitutes a case stated.

Upon a case stated, all questions of pleading ordinarily are waived and the only question open is whether the plaintiff can recover in any form of action.

The question, whether subsidiary findings by an auditor whose findings of fact are final support a conclusion by him based on the subsidiary findings, is open even though not raised by an objection brought in to him and appended to his report.

---

[1] The companion case is by Frank H. Brown and others (comprising all the defendants in the first action and additional individuals) against the plaintiff in the first action.

An "agreed statement of facts," included in a summary of evidence appended, by order of court, to the report of an auditor whose findings of fact were final, was merely an agreement as to evidence and, like the other evidence summarized, was to be used to enable the court to determine whether the evidence warranted the findings to which the summary pertained.

A delivery of securities by their owner "for the purpose of exchange or sale and reinvestment" was a bailment for such purposes.

A bank, whose executive officer, concealing his acts from the other officers, fraudulently took securities of a customer, which had been placed in the possession of the bank as bailee, and pledged them upon the officer's personal margin account with a firm of stockbrokers, employees of whom in the course of their employment knew of and assisted the officer in the perpetration and concealment of the fraud, was not bound by the guilty knowledge of the officer, but the stockbrokers were bound by the guilty knowledge of their employees, were not bona fide purchasers of the securities, and were liable to the bank for the proceeds received by them upon a sale of the securities at the order of the officer.

A statement by an auditor whose findings of fact were final, in response to an order to append to his report a summary of the evidence on a principal issue, that a summary of the evidence on that issue was set forth in the report, meant that the summary was contained in the subsidiary findings and had the effect of making it appear from the report that the auditor's general finding on that issue was based on the subsidiary findings.

A conclusion that bonds were sold by a stockbroker to an officer of a bank personally and not to the bank was proper where it appeared that the officer ordered the purchase of the bonds through an account with the stockbroker, known by the stockbroker to be his personal account, and used them to replace similar bonds previously stolen by him from a "portfolio" of securities pledged to the bank by a customer; that, although the purchased bonds were delivered at the bank by direction of the officer and were there receipted for by a cashier, the officer successfully concealed the theft and the existence of his account with the stockbroker from the other officers of the bank; and that the stockbroker knew or had reason to know that the officer "personally was purchasing these bonds on a frolic of his own" and made no attempt to charge the bank for the bonds for over a year after the purchase.

A bank was not liable, on any ground of ratification, for the price of bonds purchased by its executive officer personally, without full knowledge of all the material facts on the part of its other officers, and used by him to replace similar bonds which, without knowledge of the other officers, he previously had stolen from a "portfolio" of securities pledged to the bank by a customer.

CONTRACT OR TORT. Writ in the Superior Court dated May 14, 1936. Also an action of

CONTRACT. Writ in the Superior Court dated March 21, 1939.

The cases were heard by *Cabot*, J., upon an auditor's reports.

*W. P. Everts*, for Paine and others.

*W. B. Luther & R. B. Walsh*, for Union Old Lowell National Bank.

WILKINS, J. Union Old Lowell National Bank (hereinafter called the bank) brings an action of contract or tort against the members of a firm of stockbrokers, known as Paine, Webber and Company (hereinafter called Paine Webber), for money had and received or for conversion of securities. Paine Webber brings an action of contract against the bank for the purchase price of certain bonds. The cases were referred to an auditor, who filed a report. It was then stipulated that his findings of fact should be final. The cases were recommitted three times to the auditor, who filed three supplemental reports, the first and second of which were in effect superseded by the third, to which were appended objections brought in by Paine Webber, and a summary of evidence on certain issues pursuant to court order. The bank filed a motion in each case for judgment on the auditor's report. The motions were allowed by a judge, who in the action by the bank against Paine Webber "found" for the plaintiff on the contract counts, and in the action by Paine Webber against the bank "found" for the defendant. Paine Webber appealed. G. L. (Ter. Ed.) c. 231, § 96.

The auditor's report was in effect a case stated, and the action of the judge thereon an order for judgment in each case. *Edinburg* v. *Allen-Squire Co.* 299 Mass. 206, 207. *Mason* v. *Wylde*, 308 Mass. 268, 270. The scope of review in this court upon a case stated has been repeatedly decided. It was the duty of the judge, and is now our duty, to enter the correct judgment on the auditor's report. *Redden* v. *Ramsey*, 309 Mass. 225, 227. *Battista* v. *F. W. Woolworth Co.* 317 Mass. 179. We are in the same position as to both fact and law as was the judge below. *Howell* v. *First of Boston International Corp.* 309 Mass. 194, 196.

The auditor's findings of subsidiary facts must stand unless there was no evidence in law sufficient to warrant them, but conclusions of fact by way of inference from such findings are open to revision here. *United States Fidelity & Guaranty Co.* v. *English Construction Co.* 303 Mass. 105, 108–110. *Keefe* v. *Johnson,* 304 Mass. 572, 573. *Galluzzi* v. *Beverly,* 309 Mass. 135. *Lewis* v. *Conrad & Co. Inc.* 311 Mass. 541, 542–543. *Mahoney* v. *C & R Construction Co.* 311 Mass. 558, 559. *Harsha* v. *Bowles,* 314 Mass. 738, 739–740. *Caissie* v. *Cambridge,* 317 Mass. 346, 347. *Benjamin . Foster Co.* v. *Commonwealth, ante,* 190. Cases relied upon by the bank as plaintiff as tending to support the proposition that upon a case stated this court is bound by the trial judge's inferences of fact unless unwarranted in law may no longer be cited as authorities to that effect, as was pointed out in *United States Fidelity & Guaranty Co.* v. *English Construction Co.* 303 Mass. 105, 109. See *Howell* v. *First of Boston International Corp.* 309 Mass. 194, 196.

### The First Case.

The auditor found that "upon all the evidence . . . every allegation of fact contained in the bank's declaration is borne out by the evidence." This places upon us the burden of searching through the declaration, and segregating the allegations of fact. For many years one Ivan O. Small was vice-president of the bank, and in connection with his duties from time to time received from its customers securities for "holding, exchanging or selling . . . and reinvesting the proceeds for the benefit of said customers." Two such customers were Mrs. Katherine L. Welch and Miss Mary E. Lennon, who, on various dates between September 12, 1933, and June 6, 1934, delivered to Small "as representative" of the bank certain bonds "for the purpose of exchange or sale and reinvestment." Without the authority or knowledge of the bank or of these customers, as Paine Webber "through their agents well knew," Small pledged the bonds with Paine Webber as collateral security for a margin account he opened.

From time to time beginning in September, 1933, Paine Webber, upon the orders of Small, sold certain bonds, and out of the proceeds bought for Mrs. Welch and Miss Lennon other bonds, some of which were respectively given to them and some of which were sold for reinvestment. In July, 1934, Mrs. Welch and Miss Lennon discovered that their bonds had been pledged, and demanded them and their respective balances of uninvested proceeds from Paine Webber, who complied as to the bonds still in their possession, but refused to pay the balances. Mrs. Welch and Miss Lennon then demanded the amounts of the balances from the bank, which thereupon paid them. As conclusions of law, it is alleged that Paine Webber was liable to Mrs. Welch and Miss Lennon for money had and received to their use, "the right to receive which . . . passed" to the bank, and that the bank, "by reason of said payment, succeeded to all the rights" of Mrs. Welch and Miss Lennon against Paine Webber. The allegations of law we may disregard as surplusage. *Jones* v. *Dow*, 137 Mass. 119, 121. *Gallo* v. *Foley*, 299 Mass. 1, 4. *O'Connor* v. *Brockton*, 308 Mass. 34, 37. Moreover, upon a case stated, all questions of pleading ordinarily are waived. *Nowell* v. *Equitable Trust Co.* 249 Mass. 585, 596. *Markus* v. *Boston Edison Co.* 317 Mass. 1, 7. The only question open is whether the plaintiff can recover in any form of action. *G. E. Lothrop Theatres Co.* v. *Edison Electric Illuminating Co.* 290 Mass. 189, 191. This rule applies to the report of an auditor whose findings of fact are final. *Kennedy* v. *B. A. Gardetto, Inc.* 306 Mass. 212, 220–221.

The auditor's original report contained further findings. Small was "executive" vice-president of the bank, in charge of its management and carrying out policies under the direction of the president, John Sawyer, and had practically exclusive control of buying and selling securities for the bank's customers. In 1933, Small embarked upon "a scheme of fraud and deception," to make which effective it was necessary to keep the transactions secret from the bank officials, and at the same time preserve a feeling by customers that Small was in fact acting as vice-president

and as the bank's authorized agent. Accordingly, he "abandoned" an account with Paine Webber which required no collateral, and on August 21, 1933, opened the margin account with Paine Webber. The account was first entitled "Ivan O. Small C/o Union Old Lowell National Bank, Lowell, Massachusetts." Later the words "Customers' A/C" were added after "Ivan O. Small." Still later, on April 3, 1934, Small sent to one Gately, an employee of Paine Webber in charge of the margin department, the following letter: "Dear Sir: The account standing in the name of Ivan O. Small 'Customers Account' on Paine Webber & Co. books is simply a clearing account for securities bought and sold for my customers. Yours very truly, Ivan O. Small." This was sent because of an inquiry made of Small "evidently by Gately" following a discussion by two partners of Paine Webber arising out of a question asked by their auditor. "It is perfectly apparent from an examination of the account itself, even prior to the writing of the letter of April 3, 1934, that the account . . . was, in fact, a margin account, that Small was using the securities entrusted to him by the customers of the bank for his own purposes and to his own ends and that this situation was known to responsible employees of Paine, Webber & Co." One Holdsworth, a salesman of Paine Webber, was introduced at the bank by Small to Mrs. Welch and Miss Lennon as "a very able representative of Paine Webber" who would work with Small to try to increase the value of their securities and their income. In reliance thereon Mrs. Welch and Miss Lennon "entrusted to Small as vice-president of the bank, as Holdsworth well knew, their securities for purposes of investment. Holdsworth at all times knew what Small was engaged in doing and assisted in the concealment of the affairs and manipulations of Small from the bank. . . . Small's position as vice-president of the bank was known to Paine, Webber & Co. He was regarded by Holdsworth as 'the king who could do no wrong.' As executive vice-president Small was possessed of wide powers." The securities purchased in the account were uniformly inferior, and "sounded

definite and continued warnings to Paine, Webber & Co. that Small was engaged in speculation." Paine Webber allowed Small to make withdrawals both by check and in cash. In January, 1934, the mailing address of statements of the account was changed from Small in care of the bank to Small's private post office box in Chelmsford. After July, 1934, when Small went to Arizona and the bank notified Paine Webber that Small had resigned as vice-president, the statements were held in the office of Paine Webber under direction of Holdsworth. There was no "revelation" to the bank of the existence of the account by Paine Webber until October, 1934, and "the bank was kept by Paine, Webber & Co. from information" concerning the account until that date. The "concealment by Small of his scheme from the bank itself and from the customers of the bank was made possible to a large and devastating extent by Paine, Webber & Co. . . . The bank might well have known, had Paine, Webber & Co. not actively assisted Small in keeping his scheme secret." Small's "fraud is not attributable to the bank nor am I able to find any facts upon which to predicate a finding that the bank had . . . or should have had sufficient knowledge to have justified suspicion of these frauds. . . . It is clear that the account was conducted in such a way by Paine, Webber & Co. that its existence would not be known by the bank. . . . [Complete] and ever-present knowledge of Small's scheme was known to two parties: 1, Small and 2, Paine, Webber & Co. Both parties concealed their knowledge from the bank." The auditor then made findings relative to bonds of one Cover, which will be recited later, and stated: "I find that Paine, Webber & Co. intended to deal with Ivan O. Small in all of its transactions, including the Cover transaction, personally and that, therefore, the culpable and inexcusable negligence which Paine, Webber & Co. attributes to the bank is, in fact, its own culpable and inexcusable negligence; that in no way did the bank mislead Paine, Webber & Co.; that, to the contrary, Paine, Webber & Co. misled the bank and the customers of the bank."

Still further findings are contained in the auditor's third supplemental report. The bank had no knowledge that there was an Ivan O. Small customers' account or that Mrs. Welch and Miss Lennon were beneficiaries of it. Mrs. Welch and Miss Lennon frequently talked with Small "as an officer of the bank" in connection with investments and reinvestments. They dealt only with Small, and never told the president about their dealings with Small. When at the bank talking with Small they were within sight of other officers of the bank. The securities handed to Small by Mrs. Welch and Miss Lennon were receipted for by Small or by one Cooper, an assistant cashier. Some receipts were in the handwriting of a Miss Allen, a stenographer, and were signed by Cooper, who was called over to Small's desk by Small. The cashier of the bank, one Bourgeois, did not know that there was an Ivan O. Small customers' account at Paine Webber's or that Small was doing business with Paine Webber. Bourgeois knew that Small was advising Mrs. Welch and Miss Lennon as to the purchase and sale of securities, but did not know that Small was doing so through Paine Webber. The first intimation that Bourgeois had that anything was wrong with any account or matter at the bank handled by Small was around Easter, 1934, with respect to the Cover collateral hereinafter referred to. Mail arriving at the bank was left with the head stenographer for sorting and distribution, and letters addressed to an officer individually were not opened. Small exercised his authority as executive vice-president to conceal the true nature of his dealings, and Paine Webber assisted Small throughout. It was known to Holdsworth that subordinates of the bank would obey Small's instructions. In the exercise of his authority as executive vice-president Small caused unauthorized withdrawals to be made of customers' funds and subsequently deposited these funds to his own account. During 1933 and 1934 without questioning Small's authority "the bank tellers cashed various checks" upon the authorization and approval of Small. "I find further that, in so far as it is a fact, the knowledge of any teller or suspicion of any

teller that Small was guilty of any misconduct was not revealed to any officer of the bank." Certain checks sent to the Ivan O. Small customers' account in care of the bank were deposited in the accounts of Mrs. Welch and Miss Lennon. "Small caused such deposits to be made. In so far as it is a fact, I find that such deposits did not give notice to the bank of what Small was doing with securities of Miss Lennon or Mrs. Welch. During the time of the existence of the Ivan O. Small customers' account, Small, without authority, withdrew funds from the account of one Cobban, a depositor of the bank, and put these funds in his own account. Small also forged the signature on some checks and cashed them. I find that he was able to do these things because of his position as executive vice-president, and that the knowledge of any teller, if in fact there was such knowledge of Small's misconduct, was not revealed to any officer of the bank. In so far as it is a fact, I find that the bank had no knowledge of the above misdeeds and had no reasonable cause to know that Small was defrauding Miss Lennon or Mrs. Welch. Upon these facts and upon all the evidence considered by me, I find no culpable and inexcusable negligence on the part of the bank, either as regards Paine Webber & Co., or as regards Mrs. Welch and Miss Lennon." The last finding had to do with an issue of subrogation (see *Home Owners' Loan Corp.* v. *Baker*, 299 Mass. 158, 161), which, as hereinafter appears, we find it unnecessary to consider.

The facts as to the Cover transaction appear in the original auditor's report and in the third supplemental report. In 1931 Cover, a bank customer, deposited with the bank various securities, including $10,000 Cities Service bonds, as collateral to secure a loan. On July 19, 1933, Small took the Cities Service bonds from Cover's "portfolio," but in October, 1933, replaced them by the purchase of similar bonds. "Around Easter," 1934, Cover discovered that still other bonds were missing, and complained to Sawyer, the president, that Small had taken the bonds. Sawyer immediately spoke to Small. Later Cover arranged with Small to replace the collateral, and informed Sawyer

that the matter had been satisfactorily adjusted and was settled. "I find that Cover himself informed Sawyer, the president of the bank, that the matter had been completely straightened out to the satisfaction of Cover, that the president had lost no time in seeking to ascertain what the situation between Cover and Small was and that the president's conduct was reasonable following the assertion to him by Cover that the matter had been satisfactorily adjusted."

Paine Webber contends that the subsidiary findings of the auditor "warrant and require a finding contrary to his findings in regard to plaintiff's knowledge and to his general conclusion." These questions are open on the face of the report even if no objection has been brought in. *United States Fidelity & Guaranty Co.* v. *English Construction Co.* 303 Mass. 105, 111–112. But, in making the contention, Paine Webber indiscriminately rely, as though it were on an equality with the findings of the auditor, upon an "agreed statement of facts" contained in the summary of evidence appended to the third supplemental report. The "agreed statement of facts," however, was merely an agreement as to evidence "in place of ordinary proof." *Frati* v. *Jannini,* 226 Mass. 430, 432. It was identical in character with the other evidence contained in any summary of evidence whether appended under Rules 89 and 90 of the Superior Court (1932) or, as here, pursuant to an order of court which, while unusual, is nevertheless permitted under Rule 86 of the Superior Court (1932). The summary in the case at bar is to be used for the purpose of enabling the court to determine whether the evidence was sufficient in law to warrant the findings to which the summary relates. See *Morin* v. *Clark,* 296 Mass. 479, 483; *Meehan* v. *North Adams Savings' Bank,* 302 Mass. 357, 362. The case was recommitted to the auditor (1) to "make further findings with respect to the subsidiary facts upon the issue whether the plaintiff knew or had reasonable cause to know what Small was doing with the securities of Miss Lennon and Mrs. Welch, and how these facts bear upon whether it knew or had reasonable cause to know that Small was

defrauding them"; (2) to "determine whether the facts so found constituted, when taken in relation to all other pertinent facts considered by him, culpable and inexcusable negligence on the part of the plaintiff either as regards the defendants or as regards Mrs. Welch and Miss Lennon"; and (3) to "append to his report a brief, accurate and fair summary of so much of the evidence as relates to the above issues." In the view that we take of the case it is unnecessary to analyze the contention that the summarized evidence does not warrant the findings on the enumerated issues.

The case has been argued on the footing of subrogation and contribution among tortfeasors. Upon our view of the subsidiary findings it is unnecessary to consider those questions. Mrs. Welch and Miss Lennon delivered bonds to Small as vice-president of the bank "for the purpose of exchange or sale and reinvestment," and obtained receipts signed by Small and another employee of the bank. The transactions were contracts of bailment between the owners of the bonds and the bank for the stated purposes. *Jenkins* v. *Bacon*, 111 Mass. 373. *Brooks* v. *Davis*, 294 Mass. 236, 242. *Bailey* v. *Farmers' Bank*, 227 Ky. 179. *Farmer* v. *O'Carroll*, 162 Md. 431. *Cadwell* v. *Peninsular State Bank*, 195 Mich. 407. Am. Law Inst. Restatement: Trusts, § 5(f). 6 Am. Jur., Bailments, §§ 3, 4. See *Scollans* v. *E. H. Rollins & Sons*, 173 Mass. 275; *S. C.* 179 Mass. 346. Thereafter, Small, pursuing an independent fraudulent course, known to Paine Webber through their employees, wrongfully pledged the bonds on a speculative margin account of his own. The knowledge of Small is not to be imputed to the bank. *Shepard & Morse Lumber Co.* v. *Eldridge*, 171 Mass. 516, 531. *Broadway National Bank* v. *Heffernan*, 220 Mass. 247, 249–250. *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197, 207. *J. C. Penney Co.* v. *Schulte Real Estate Co. Inc.* 292 Mass. 42, 45. The bank was not a guarantor of the integrity of its vice-president, as is contended, so as to avoid the operation of this rule. Nor is there any finding of benefit to the bank from the wrongful use by Small of the bonds. On the other hand, Paine Webber was bound by the knowledge of its employees

acquired while acting in the scope of their employment. *Suit* v. *Woodhall*, 113 Mass. 391, 395. *New England Trust Co.* v. *Bright*, 274 Mass. 407, 415. Am. Law Inst. Restatement: Agency, § 275. The purported pledges from the outset were nullities. *Sherman* v. *Connecticut Mutual Life Ins. Co.* 222 Mass. 159, 162. *Marcotte* v. *Massachusetts Security Corp.* 250 Mass. 246, 249. They could have been treated as conversions on the part of the pledgee. *Varney* v. *Curtis*, 213 Mass. 309, 312. *Childs, Jeffries & Co. Inc.* v. *Bright*, 283 Mass. 283, 296.

On the findings, Paine Webber coöperated in the wrongful acts of Small and thus became liable to the bank for the loss sustained. *Boston* v. *Simmons*, 150 Mass. 461, 465. *Emmons* v. *Alvord*, 177 Mass. 466, 470. *Seeley* v. *Cornell*, 74 Fed. (2d) 353, 356 (certiorari denied sub nomine *Cornell* v. *Seeley*, 295 U. S. 742). *Lomita Land & Water Co.* v. *Robinson*, 154 Cal. 36, 45–46. *Titcomb* v. *Richter*, 89 Conn. 226, 229. Mechem on Agency (2d ed.) § 2137. Am. Law Inst. Restatement: Agency, § 312. Such liability could be for the retained proceeds of bonds which had been the subject of the relation between the bank and Mrs. Welch and Miss Lennon. *Lovejoy* v. *Bailey*, 214 Mass. 134, 154. *United Zinc Co.* v. *Harwood*, 216 Mass. 474, 476. Am. Law Inst. Restatement: Agency, § 314. These are the amounts for which there were findings on the counts in contract, on which the order for judgment was based.

The conclusions of the auditor which it is chiefly urged do not find support in the subsidiary findings, relate to the bank's lack of knowledge as to the existence of the Ivan O. Small customers' account, as to the sale of bonds of Mrs. Welch and Miss Lennon through Paine Webber, and as to fraudulent acts of Small respecting other customers of the bank. It is not necessary to consider these questions in detail. There is no finding indicating knowledge on the part of the bank of any fraudulent conduct of Small toward Mrs. Welch and Miss Lennon. At the most, these contentions mean that the bank was negligent toward customers. There was no finding indicating negligence of the bank toward Paine Webber. "Where there is no legal obliga-

tion or duty to do an act, there can be no negligence in an omission to perform it." *Combs* v. *Scott*, 12 Allen, 493, 497. But, in any event, it is well settled that carelessness in the charge of property does not bar the owner (in this case the bank with the rights of a bailee) from proceeding against a converter of the property. *Shepard & Morse Lumber Co.* v. *Eldridge*, 171 Mass. 516, 528, 531. *Varney* v. *Curtis*, 213 Mass. 309, 312. *Somerville National Bank* v. *Hornblower*, 293 Mass. 363, 369–370. *Row* v. *Home Savings Bank*, 306 Mass. 522, 525. Paine Webber fail to bring themselves "within the principle that a purchaser for value in good faith from one entrusted with the apparent title and absolute ownership of personal property is protected from the prior right of the true owner and pledgor because the pledgor is estopped from showing the true state of the title." *Crosby* v. *Simpson*, 234 Mass. 568, 575. See *O'Herron* v. *Gray*, 168 Mass. 573, 577–578. *Order affirmed.*

## The Second Case.

The action by Paine Webber against the bank is on an account annexed to recover for $10,000 Cities Service bonds which on October 13, 1933, were alleged to have been "purchased for and delivered to the defendant by the plaintiffs, for which the defendant promised to pay." The defence was that the bonds were purchased by Small individually. For some reason which does not appear, Small, without his theft of the Cities Service bonds on July 19, 1933, being discovered, set about to replace them. In his original report the auditor stated: "I find that these securities were, in fact, ordered by Small and sold by Paine, Webber & Co. to Small personally and that they were not authorized by the bank; that the sale was a bona fide sale from Paine, Webber & Co. to Small in his personal capacity and that the bank in no way is responsible to Paine, Webber & Co. because of Small's purchase of these securities." There was a general finding for the defendant. The auditor's third supplemental report shows the following. On October 13, 1933, Small ordered $10,000 Cities Service bonds bought

in the Ivan O. Small customers' account. The bonds were delivered upon directions from Small to the bank and were receipted for by one Hartford, "cashier." The purchase by Small was at a time when Paine Webber knew that the Ivan O. Small customers' account was a margin account. Paine Webber dealt with Small and with Small alone. Small caused the bonds to be placed in Cover's "portfolio," and Paine Webber made no demands upon the bank for payment until November 28, 1934, "when Small's misconduct had been exposed and Paine, Webber & Co.'s involvements with him had been revealed." Small caused "some bonds" related to the Cover matter to be delivered to him at his address at Chelmsford. The bank itself did not order the Cities Service bonds. "I find upon all evidence that Paine, Webber & Co. knew or had reasonable cause to know that Small personally was purchasing these bonds on a frolic of his own, and that Paine, Webber & Co. dealt with Small and not with the bank." This finding we construe as meaning that Paine Webber dealt with Small as an individual and not as an agent of the bank.

The auditor was ordered to append to his report a summary of the evidence "upon the issue whether the defendant is liable for the purchase price of the Cities Service bonds or whether they were, as the plaintiffs knew or had reasonable cause to know, purchased by Small personally while 'on a frolic of his own.'" In the third supplemental report the auditor stated that a summary of the evidence "involving the purchase of the . . . bonds" was set forth in that report and in the original report. In other words, the summary was contained in the subsidiary findings. See *Morin* v. *Clark*, 296 Mass. 479, 482–483. This had the effect of engrafting upon the auditor's report a statement that the findings upon the "issue" mentioned in the court order (which in terms included the main issue to be decided) are based upon the subsidiary findings reported. See *Dodge* v. *Anna Jaques Hospital*, 301 Mass. 431, 435–436. But this does not affect our right and duty to draw our own inferences. See cases cited, *ante*, 316.

The subsidiary facts show that Small, alone guarding the

secret of purloining Cover's bonds, ordered similar bonds to be bought "in the Ivan O. Small customers' account." The bank had no actual knowledge of the theft, and, by the design of Small and Paine Webber, no actual knowledge of the account. It was Small's account, used for his own purposes, and at first was simply in his name and not even described as a customers' account. It may have stood this way on October 13, 1933. From it at unstated times he made withdrawals by check or in cash. It was also Small's theft, for in the felonious taking of the bonds he was not acting for the bank. *Indian Head National Bank* v. *Clark*, 166 Mass. 27, 29. No attempt was made to charge the bank for over a year and not until after the exposure of Small. While not conclusive, this permits an inference that Small was the one to whom credit was knowingly and designedly given. *James* v. *Spaulding*, 4 Gray, 451, 452. *Banfield* v. *Whipple*, 10 Allen, 27, 30–31. *Slotnick* v. *Silberstein*, 221 Mass. 59, 60. This inference that Small, and not the bank, was the contracting party in the purchase is a compelling one. The auditor made it. We make it.

The conclusion that Paine Webber dealt with Small as principal is decisive of the case. See *Essex County Acceptance Corp.* v. *Pierce-Arrow Sales Co.* 288 Mass. 270, 276; *Marsh* v. *S. M. S. Co.* 289 Mass. 302, 307. It is not at variance with other subsidiary facts. The delivery of the bonds to the bank on Small's direction and the receipt by Hartford do not require the conclusion that there was a sale on the credit of the bank nor transform the transaction into such a sale. The findings establish a completed transaction of purchase by Small on his own credit before any delivery to the bank by his direction. The finding that Small caused the bonds to be placed in Cover's "portfolio" we interpret to mean that Small restored them to the collateral on Cover's note to the bank, thus vesting legal title in Cover. From this Paine Webber contends that the bank is liable because it took and retained in its possession the bonds which Paine Webber delivered to it. The ultimate disposition of the bonds is undisclosed, although the bank undoubtedly had possession of them for

whatever time they were collateral on the note. But this contention cannot elude the finding that it was Small who was the buyer. The bank's holding of the bonds as collateral was derived, not from the contract of purchase, but. from the subsequent act of Small, who, as owner once he had bought them, could do as he pleased with them. It is not a case of the bank having to take any bitter with the sweet, if, indeed, it took any sweet. Compare *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197, 207. The bank, in the circumstances, is not to be held to a ratification as matter of law on the ground that it has taken benefits of the transaction of purchase subject to the knowledge of its vice-president. Cases like *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268, 274, and *Chapple* v. *Merchants National Bank*, 284 Mass. 122, are not in point. In any event, the bonds were not procured by Small from Paine Webber through fraud, and in receiving them the most that could be charged to the bank is knowledge that they had been bought by Small on his own credit in order to replace other bonds he had taken from the Cover collateral. Nor was there ratification in fact, because, if for no other reason, the purchase was not made for, or in the name of, the bank as principal. *New England Dredging Co.* v. *Rockport Granite Co.* 149 Mass. 381, 382. *Allen* v. *Liston Lumber Co.* 281 Mass. 440, 446. *Wedgwood* v. *Eastern Commercial Travelers Accident Association*, 308 Mass. 463, 468. This is sufficient to distinguish *Foster* v. *Rockwell*, 104 Mass. 167, 172, *Sartwell* v. *Frost*, 122 Mass. 184, and similar cases. There also was no full knowledge of all the material facts on the part of the bank. *Kelley* v. *Newburyport & Amesbury Horse Railroad*, 141 Mass. 496, 499. *Eastern Advertising Co.* v. *Standard Nut Co. Inc.* 264 Mass. 238, 242. *American Agricultural Chemical Co.* v. *Robertson*, 273 Mass. 66, 84.

*Order affirmed.*